**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PATRICIA P. CAMPBELL,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>STATE OF HAWAII DEPARTMENT OF EDUCATION; PATRICIA HAMAMOTO, Superintendent of Public Schools, sued in her official capacity; BRUCE ANDERSON, Maui Complex Area Superintendent, sued in his individual and official capacities; SUSAN SCOFIELD, Principal of King Kekaulike High School, sued in her individual and official capacities; ANTHONY JONES, Vice Principal of King Kekaulike High School, sued in his individual and official capacities; ROBYN HONDA, Personnel Regional Officer, sued in her individual and official capacities; BARBARA OURA, Vice Principal of King Kekaulike High School, sued in her individual and official capacities; KURTIS SAIKI, Athletic Director of King Kekaulike High School, sued in his individual and official capacities,<br>*Defendants-Appellees.* | No. 15-15939<br><br>D.C. No.<br>1:13-cv-00083-DKW-RLP<br><br>OPINION |

2     CAMPBELL V. STATE OF HAWAII DEP'T OF EDUC.

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted February 12, 2018
Honolulu, Hawaii

Filed June 11, 2018

Before: Diarmuid F. O'Scannlain, Richard R. Clifton,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Employment Discrimination

The panel affirmed the district court's grant of summary judgment in favor of the defendants on employment discrimination claims brought by a public high school teacher who was verbally harassed by her students.

Affirming the district court's grant of summary judgment on the teacher's Title VII claims of disparate treatment based on her sex and race, the panel held that the teacher failed to establish a prima facie case because she did not show that she was subject to an adverse employment action or that similarly situated individuals outside her protected class were treated more favorably.

The panel also affirmed the district court's grant of summary judgment on the teacher's Title VII hostile work environment claim. The panel held that the defendant public school system could be held liable for students' harassing conduct only to the extent that it failed reasonably to respond to the conduct or ratified or acquiesced in the conduct.

On the teacher's Title VII retaliation claim, the panel held that she failed to establish that the defendants' asserted rationale for its actions was mere pretext.

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4       CAMPBELL V. STATE OF HAWAII DEP'T OF EDUC.

Finally, the panel affirmed the district court's grant of summary judgment on the teacher's Title IX claims for intentional discrimination.

## COUNSEL

Daphne E. Barbree (argued), Law Office of Daphne Barbee, Honolulu, Hawaii, for Plaintiff-Appellant.

Miriam P. Loui (argued) and James E. Halvorson, Deputy Attorneys General; Douglas S. Chin, Attorney General; Department of the Attorney General, Honolulu, Hawaii; for Defendants-Appellees.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a high school teacher who was verbally harassed by her students has identified sufficient evidence to support claims for violations of her federal civil rights against the public school system that employed her.

I

Patricia Campbell was employed by the Hawaii Department of Education (DOE) from 2000 until she resigned in July 2009. From 2004 through 2007, Campbell taught music and band at King Kekaulike High School (KKHS) on the island of Maui. Unfortunately, Campbell's experience at KKHS was hardly pleasant. Instead, her tenure at the school was marred by numerous accusations of misconduct perpetrated against, and by, Campbell.

### A

Campbell alleges that, throughout her time at KKHS, she was frequently harassed and degraded by students on the basis of her race (white) and her sex (female).  She alleges that students called her a slew of offensive names, including "fucking weirdo," "cunt," "bitch," and "fucking haole."[1] According to Campbell, she was even physically threatened by one student who claimed to have a gun.

Campbell routinely reported the students' misconduct to DOE administration during the 2006–2007 school year.  In response, Vice Principals Barbara Oura and Anthony Jones investigated Campbell's many complaints and imposed a variety of disciplinary measures against those students who were found to have misbehaved.  The punishments ranged in severity based on both the nature of the misconduct and the student's past disciplinary history.  Some students were given formal warnings or disciplinary counseling, others were placed in detention, and some were suspended from school for up to three days.  Four students were even transferred out of Campbell's classes at her request. Although Campbell has no reason to doubt that these disciplinary measures took place, she claims that the school never informed her of them at the time.

### B

Contemporaneously, Campbell herself was the subject of numerous complaints.  During the 2006–2007 school year, Vice Principal Oura investigated complaints which the DOE

---

[1] "Haole," as previously described by our court, is "a Hawaiian term, sometimes used derogatorily, referring to persons of the Caucasian race." *BKB v. Maui Police Dep't*, 276 F.3d 1091, 1095 n.2 (9th Cir. 2002).

had received from students, parents, and at least one other teacher, accusing Campbell of a variety of misconduct, including physical and verbal abuse of students, discrimination against students, and failure to maintain a safe classroom environment. Because the DOE determined that Campbell's presence on campus would not interfere with the investigation or present a threat to students, she was allowed to continue working during the investigation. On March 22, 2007, Oura concluded her investigation and found that Campbell had intimidated and discriminated against students, physically grabbed and verbally abused students, failed adequately to supervise students at school-sanctioned activities, and harassed a colleague. Despite Oura's findings, the DOE took no action against Campbell, who was allowed to keep her position at the school.

On May 7, 2007, Campbell reportedly stormed into the office of Vice Principal Jones as he was meeting with a student. It is not entirely clear why Campbell confronted Jones, but she allegedly yelled at Jones and others in the office and refused to leave when asked. Two days later, Jones held a counseling meeting with Campbell to discuss the incident, and he later gave Campbell a memorandum documenting that meeting. Among other things, Jones's memorandum stated that Campbell had "verbally ragged at" a security officer, and it directed Campbell not to "address adults or students on campus in a yelling or ragging manner."

Campbell took offense to the memo and in particular to Jones's use of the words "ragged" and "ragging," which she believed to be a reference to her menstrual cycle. The same day she received the memo, Campbell complained to the DOE Superintendent's office about the incident and claimed that Jones had stalked and sexually harassed her. Within a

week, the DOE initiated an investigation into Campbell's allegations, which concluded roughly two months later. The investigator ultimately found that there was not enough evidence to sustain Campbell's allegations. In particular, the investigator found that Jones's use of the words "ragged" and "ragging" was not derogatory, but rather was used to mean that Campbell "railed at" or "scolded" others. No further action was taken against Jones as a result of the investigation.

C

At some point before the 2007–2008 school year, Campbell requested a transfer to teach elsewhere on Maui—specifically, to serve as the band director at Iao or Kalama Intermediate Schools or to teach kindergarten at Haiku School. Campbell alleges that she personally knew that the band teacher at Iao retired in June 2007 and that the band director at Kalama also "retired in 2007," though she does not specify when. She further alleges that she "was aware there was a kindergarten teaching position open at Haiku," but she again does not provide any further detail about when that position became open.

None of Campbell's transfer requests was granted. With respect to the band teaching position at Iao, the DOE submitted evidence indicating that Campbell's request was denied because such position was not open during the school's annual transfer period in the Spring of 2007[2] and Campbell failed to provide any information that would qualify for an emergency transfer outside the normal transfer

---

[2] The transfer period ran from February 28, 2007, through May 8, 2007, and the position did not become vacant until the band teacher retired on July 31, 2007.

window.  Evidence in the record suggests that Campbell's requests to transfer to the other schools were also untimely, and she has not argued otherwise.

Unable to transfer, in August 2007 Campbell requested and was granted a 12-month leave of absence without pay due to work-related stress.  Before the next school year, Campbell requested and was granted a second year of unpaid leave.  In July 2009, as her second period of leave was coming to an end, Campbell learned that, because there were not enough students to support a full slate of music classes, she had been assigned to teach three remedial math classes and one or two music classes for the upcoming year. Campbell told Principal Susan Scofield that she wouldn't teach remedial math (a subject for which she was not certified), but Scofield insisted that Campbell would need to teach such classes in order to complete her schedule. Campbell never reported back to work after her leave expired.  After being told that she would be fired if she did not return to work, Campbell resigned.  Her resignation indicated that she had left the school because of a hostile work environment, fear for her safety, and her desire not to teach remedial math.

### D

On February 19, 2013, Campbell filed this suit against the DOE and various administrators (defendants collectively referred to as "the DOE"), alleging violations of her federal and state civil rights.  In particular, Campbell alleged that she had been subjected to several acts of discriminatory treatment and a hostile work environment because of her race and her sex and that she had been retaliated against for complaining of harassment at the school.

The district court granted partial judgment on the pleadings to the DOE and dismissed several of Campbell's claims.  The court later granted summary judgment for the DOE on Campbell's remaining claims of disparate treatment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 and sex discrimination under Title IX of the Education Amendments of 1972.  Campbell timely appealed but she challenges only the district court's order granting summary judgment on these four categories of claims.  She does not challenge the court's earlier dismissal of her other claims.

II

We first consider Campbell's argument that the district court erred in granting summary judgment to the DOE on her Title VII disparate treatment claims.

Title VII forbids certain employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Campbell argues that the DOE violated this provision by subjecting her to disparate treatment because of her sex and race.  To prevail, Campbell must first establish a prima facie case by showing that: (1) she belongs to a protected class, (2) she was qualified for the position in question, (3) she was subject to an adverse employment action, and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).

If she does, the familiar *McDonnell Douglas* burden-shifting framework applies. *See id.* at 1123–24. Under such framework, if Campbell establishes a prima facie case, the

burden of production shifts to the DOE to articulate a legitimate, nondiscriminatory reason for the challenged conduct. *Id.* If the DOE does so, the burden then shifts back to Campbell to show that the reason offered is pretextual. *Id.* at 1124.

The DOE concedes that Campbell can establish the first two elements of her prima facie case. The DOE argues, however, that the record does not contain sufficient evidence to establish the remaining elements of her claim. We agree.

## A

For claims of disparate treatment under Title VII, an adverse employment action is one that "materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and alterations omitted). Although Campbell argues that she suffered a number of such actions, none are availing.

## 1

First, Campbell argues that the DOE committed an adverse employment action by losing her 2006 performance evaluation (in which she had been rated satisfactory in all categories). But Campbell has not identified any evidence that would show how the loss of such evaluation could have materially affected the terms or conditions of her employment. For example, there is nothing in the record to suggest that the DOE's inability to locate Campbell's performance evaluation had any bearing on the school's decision to take other actions regarding her employment. *Cf. Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (employment evaluation that was not disseminated and did not lead to any changes in the employee's job

responsibilities or benefits was not adverse employment action). Further, the DOE does not deny that Campbell's performance in 2006 was indeed satisfactory, and there is nothing to indicate that anyone at the DOE has attempted to portray Campbell's performance more negatively than was reflected on the evaluation.

The district court did not err in concluding that the loss of Campbell's performance evaluation was not an adverse employment action.

2

Next, and without elaboration, Campbell argues that the school's decision to "instigat[e] an investigation against" her was an adverse employment action. But, as noted above, Campbell was allowed to continue to work as normal throughout this investigation, and even though the investigator found that Campbell had committed misconduct, the DOE nonetheless took no action against her as a result. Indeed, Campbell does not identify a single aspect of her work that changed as a result of the investigation. The mere fact that the school received and investigated allegations of misconduct against Campbell— with no resulting change to the conditions of her employment—is not an adverse employment action for purposes of her disparate treatment claim.[3]

---

[3] As addressed below, merely investigating an employee might be a sufficient adverse employment action for purposes of a Title VII *retaliation* claim. *See Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 803 n.7 (9th Cir. 2009); *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007).

### 3

Campbell next argues that the DOE's denial of her request to transfer to another school was an adverse employment action. Adverse employment actions may include not only actions an employer affirmatively takes against an employee (e.g., firing or demoting the employee) but also situations in which the employer denies an employee a material employment benefit or opportunity that was otherwise available to her. *See, e.g.*, *Breiner v. Nev. Dep't of Corr.*, 610 F.3d 1202, 1208 (9th Cir. 2010) ("[T]he denial of a single promotion opportunity . . . is actionable under Title VII."); *Chuang*, 225 F.3d at 1124–25 (denial of promotion to tenured position that had been promised to a professor was adverse employment action). The record, however, does not support the conclusion that Campbell was ever denied a transfer opportunity that her job actually promised.

Campbell concedes that the DOE provided formal rules for how tenured teachers like she could request a transfer to a different school. Yet the record contains no evidence that Campbell ever requested a transfer through such procedures. Indeed, as outlined above, the record contains unrebutted evidence that Campbell had *not* gone through the proper transfer procedures and had failed to request any transfer during the applicable transfer window from February 28, 2007, through May 8, 2007. Campbell herself stated that she did not request a transfer until July 2007, well past the deadline. Moreover, Campbell has not identified evidence that would contradict the testimony of the DOE's personnel officer that Campbell failed to support a case for an emergency transfer that could be granted outside the normal procedures. There is no indication that the DOE had any other policy or practice that would have allowed for

consideration of untimely and non-emergency transfer requests like hers. *Cf. Chuang*, 225 F.3d at 1124–25 (denial of tenure to professor who failed to submit formal application was adverse action because school had granted tenure in similar circumstances to other professors).

In short, the record cannot support the conclusion that Campbell ever availed herself of the established channels through which she might have been able to receive a transfer. The failure to give Campbell what would essentially have been a gratuitous accommodation was not an adverse employment action.

4

Campbell also complains that, unlike some male teachers who were put on paid administrative leave while the school investigated complaints against them, she was never given leave with pay.  It is not clear whether Campbell means to argue that the DOE committed an adverse employment action by failing to place her on paid leave during its investigation into the complaints against her, or that the DOE committed such an action by failing to pay her during her two years of voluntary leave.  Regardless, both arguments are meritless.

To the extent that Campbell complains that she was not involuntarily placed on paid administrative leave during the school's investigation of her, she is essentially complaining that the DOE chose *not* to alter the terms and conditions of her employment.  By not placing Campbell on leave, the DOE instead allowed her to continue working just as she had before, with no changes in her duties or the conditions of her work.  This decision to retain the status quo is quite obviously not an adverse employment action.

14    CAMPBELL v. STATE OF HAWAII DEP'T OF EDUC.

If Campbell means to argue that she should have been paid during her two years of voluntary leave, she has completely failed to support the notion that the DOE had any policy or practice that would allow teachers to volunteer for extended periods of paid leave. The fact that other teachers might have been paid when they were *forced* by the DOE to take administrative leave is beside the point. The DOE never placed Campbell on leave, nor did it do anything to prevent her from continuing to work in her job if she so chose. Campbell voluntarily applied for two consecutive years of unpaid leave, and the school simply granted her requests. Granting a teacher's own request to take two years off of work can hardly be said to be an adverse employment action.

5

Campbell next argues that the DOE committed an adverse employment action when it assigned her to teach remedial math classes (in addition to some music classes) upon her anticipated return to teaching in 2009. Campbell argues that because she was not certified to teach math, she should have been given either additional music classes or French classes, for which she is actually certified.

First, the record contains no evidence that the classes Campbell preferred to teach were even available during the 2009–2010 school year. Indeed, Principal Scofield testified that there were *not* enough music classes to fill Campbell's schedule. Second, Campbell has not identified any evidence that would suggest the school had a policy or practice that promised teachers they would only be assigned to classes within certification areas. Again, Principal Scofield provided unrebutted testimony to the contrary, stating that "[a]ny other full time teacher without a complete complement of classes . . . for the 2009–2010 school year also would have been assigned to teach classes outside of

his/her certification area(s)."    Indeed, Campbell herself admitted that another band teacher at the school—Mr. Ota, who had replaced her during her leave of absence—had also been assigned to teach a subject for which he was not certified (Japanese).

Because there were not enough music classes, and because Campbell had specifically requested not to teach dance anymore, Campbell needed additional classes to fill her schedule.  It so happens that the classes the school found available for her were in remedial math.  There is nothing in the record to suggest that such assignment was unusual or, more to the point, that it materially altered any term or condition of Campbell's employment at the school.  Such assignment was not an adverse employment action.

6

Finally, Campbell argues that the DOE's failure to respond adequately to her complaints of offensive student conduct was also an adverse employment action.  The record simply does not support such assertion.  As explained below, there is no genuine dispute that the DOE *did* respond adequately to Campbell's complaints by taking prompt action that was reasonably calculated to end the harassment she alleged.  *See infra* Part III.A.  The DOE's thorough action in response to Campbell's complaints did not adversely affect the terms or conditions of her employment.[4]

---

[4] Campbell appears to have abandoned on appeal two additional adverse employment actions that she argued before the district court: (1) that she was assigned an "excessive" class schedule in 2006 and (2) that she was denied the opportunity to lead the band at its

B

Moreover, even if the various alleged actions *could* be adverse employment actions, the record is devoid of evidence that any similarly situated employees of a different race or sex were treated more favorably than Campbell was. To satisfy such element, Campbell must identify employees outside her race and sex who were similarly situated to her "in all material respects" but who were given preferential treatment; they must "have similar jobs and display similar conduct." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009) (internal quotation marks and emphasis omitted).

For many of Campbell's claims, she has not identified even a single employee for comparison. For example, Campbell has not identified any other employees whose untimely transfer requests were granted, who were accused of misconduct but were not investigated by the DOE, or whose complaints of student harassment were handled any differently than her own. Indeed, Campbell has identified

---

performance at a state championship football game. Regardless, both arguments would fail.

First, there is no actual evidence that Campbell was given an especially burdensome class schedule. In 2006, she was assigned to teach five subjects and a total of six classes; Principal Scofield provided unrebutted testimony that such a schedule constitutes a "regular teaching line of classes."

Second, even assuming Campbell was not allowed to lead the band at the championship football game, she has failed to show how her inability to work at a single extracurricular activity somehow materially altered the terms or conditions of her employment.

only a handful of individuals who seem to have any relevance to her case at all.

First, she claims that some male teachers were placed on paid administrative leave as the DOE investigated allegations of misconduct against them.  But, even assuming that these men were similarly situated to Campbell in all material respects (which she has hardly attempted to show), we have no reason to conclude that they were treated any more favorably than she was.   As mentioned, during Campbell's investigation, she was allowed to *continue working* without restriction; it cannot be said that being forced to take involuntary (even paid) leave is somehow preferable to that.  Indeed, we have held that, at least for purposes of a First-Amendment retaliation claim, being placed on involuntary paid leave can *itself* be an adverse employment action.   *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (en banc).  Even if Campbell is right that she was treated differently than these men solely because of her sex or her race, she has shown only that she was treated *better* on that account.

Second, Campbell has argued that her replacement, Mr. Ota, was not required to teach remedial math but instead taught Japanese, a course for which he was not certified.  But Campbell has failed to show that she and Mr. Ota were similar in all material respects.  There is no indication, for example, what other classes he taught, how full his schedule was, the relative availability of other teachers to fill in for the various classes at issue, or indeed whether he even wanted to teach Japanese or was simply assigned it out of necessity.  Moreover, her comparison actually undercuts her claim of disparate treatment, as it shows that other teachers were also assigned to teach classes for which they were not certified.

Campbell has also argued that Mr. Ota was generally treated more favorably than she was and was allowed certain liberties she was not. But even if that is true, Campbell has not identified evidence that would show he was treated more favorably in the specific situations relevant to her claims. The record is completely devoid of any indication, for example, that Mr. Ota filed transfer requests that were handled differently, that the school declined to investigate allegations of misconduct against him, or that he was granted extended periods of paid leave. The general comparison, therefore, is beside the point.

## C

In sum, Campbell has failed to identify any evidence showing that she suffered an adverse employment action and the record is almost completely silent as to whether the treatment Campbell experienced was shared by others in materially similar circumstances. The district court did not err in holding that, on the basis of such record, Campbell cannot establish a prima facie claim for disparate treatment.

## III

Campbell also argues that the DOE violated Title VII by creating a hostile work environment that adversely affected the terms or conditions of her employment. To establish a prima facie case, Campbell must be able to show that, because of her race or sex, she was subjected to unwelcome conduct that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (internal quotation marks omitted). The work environment must be both subjectively and objectively perceived as abusive. *Id.* We consider all circumstances, with a particular focus on issues

such as the frequency and severity of the conduct, whether the conduct was physically threatening or humiliating, and the extent to which it unreasonably interfered with Campbell's work performance. *Id.* She must also be able to show that the DOE itself is "liable for the harassment that caused the hostile environment to exist." *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006).

A

Campbell primarily argues that her work environment was made hostile by the derogatory comments she received from students. First, we observe that most of the complaints Campbell referred to the school were about issues unrelated to her harassment claims—for example, class cutting or general insubordination. Campbell did also submit several referrals for offensive comments that were, by their very terms, based on Campbell's race or sex, some of which were severe. But the students were not Campbell's employers. Thus, even if comments like the students' are sufficient to create a hostile work environment, the DOE may be held liable for the students' harassing conduct only to the extent that it failed reasonably to respond to the conduct or to the extent that it ratified or acquiesced in it. *See id.* at 538; *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 755–56 (9th Cir. 1997). That is, the DOE may be held to account for the students' actions only if, after learning of the harassment, it failed to take prompt corrective measures that were "reasonably calculated to end the harassment." *Freitag*, 468 F.3d at 539–40 (internal quotation marks omitted).

The record contains unrebutted evidence that, once it learned of the students' alleged harassment of Campbell, the DOE did quite a lot in response. Campbell does not deny that vice principals promptly investigated all incidents of

student misconduct she reported or that the school took corrective action where her complaints were substantiated. As we have related, those actions varied from issuing warnings to some students, to placing others in detention, suspending them, and even transferring some out of Campbell's classes.  A few of Campbell's complaints were found after investigation to be unsubstantiated and thus resulted in no discipline for the students.  But Campbell has not argued (and we see no evidence that would show) that the DOE's findings on such complaints were unfounded or that the process that led to them was inadequate.  *Cf. Swenson v. Potter*, 271 F.3d 1184, 1196–97 (9th Cir. 2001) (employer may reasonably decline to discipline alleged harasser if, after conducting a fair investigation, it does not "find what [the employer] consider[s] to be sufficient evidence of harassment").  In other words, there can be no dispute at this point that the DOE promptly evaluated and responded to each of Campbell's complaints.[5]

Campbell does not seriously grapple with the reasonableness of the many measures the DOE undertook. Instead, her chief complaint seems to be that the DOE was unable to put a complete stop to the harassment immediately, and that students continued to harass her even after she complained to the school.  As a factual matter, Campbell seems to overstate her case.  Our record reflects very little

---

[5] At most, Campbell suggests that she does not know whether appropriate procedures were followed in all cases, because the school failed to notify her at the time of any disciplinary measures it took against the students.  First, there is evidence in the record that such that such information *was* available to Campbell in the school's computer database or upon request.  Second, at this stage, the critical point is that Campbell has failed to discover any evidence at all to contradict the DOE's testimony that the school did indeed follow such procedures in response to all of Campbell's complaints.

recurrent harassment by students after they were disciplined for similar conduct. During the 2006–2007 school year, hardly any students were even referred by Campbell for harassing her more than once, let alone found to have done so. Moreover, of the many referrals filed by Campbell during the school year, only four were for harassment that occurred sometime after December 2006—three from the same date in May 2007. As conceded at oral argument, at most two of these referrals related to students who had been disciplined for similar conduct before. And the record does not reflect that any of the students later harassed Campbell again. In other words, the evidence in the record suggests that the school's disciplinary process was quite effective at stopping students from repeatedly harassing Campbell over the course of the year.

More fundamentally, our law does not require an employer to be immediately and perfectly effective in preventing all future harassment by a third party. Again, the question is one of negligence: Did the employer take steps that were *reasonably calculated* to end the harassment of which it was aware? *Freitag*, 468 F.3d at 538–40; *Swenson*, 271 F.3d at 1191–92, 1196; *see also Saxon v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993) ("No doubt . . . AT & T could have done more to remedy the adverse effects of Richardson's conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment."). Although the issue of whether the employer's actions successfully ended the harassment will be relevant to the question of whether those actions were reasonable, *see Freitag*, 468 F.3d at 540, our inquiry cannot be purely retrospective. That a corrective action did not actually end the harassment does not necessarily mean that, at the time the employer chose such course of action, it was *unreasonable to expect* that it would. We can evaluate the

reasonableness of an employer's corrective measures only from the perspective of what the employer knew or should have known at the time it acted.

Thus, we have recognized that an employer must be permitted to respond incrementally to allegations of harassment by a third party. As an initial matter, the employer must learn what actually happened. Indeed, "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Swenson*, 271 F.3d at 1193. That is exactly what the DOE did here. Such an investigation, itself, "is a warning, not by words but by action" that puts all parties "on notice that [the employer] takes such allegations seriously and will not tolerate harassment in the workplace." *Id.* Even where a complaint is found to be true, sometimes counseling or formally warning the perpetrator may be a sufficient response if the circumstances suggest that such action is reasonably expected to end the problem. *See Star v. West*, 237 F.3d 1036, 1039 (9th Cir. 2001); *Intlekofer v. Turnage*, 973 F.2d 773, 780, 783, 786 (9th Cir. 1992). Of course, if the harassment continues, then the employer may need to escalate to more aggressive disciplinary measures as less severe measures prove inadequate. *See Intlekofer*, 973 F.2d at 780, 783; *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1306 (11th Cir. 2007) ("This is not a case where the employer's first remedy proved inadequate, and it failed to take further corrective action to correct the problem."). That is, the employer cannot unreasonably fail to follow through on its warnings or repeatedly resort to corrective measures that have proven ineffective.

The record in our case does not support a conclusion that the DOE effectively turned a blind eye to the students'

misconduct or that it undertook only disciplinary measures that were unlikely to resonate with the students. The school did exactly what we have held it may do: it responded to the circumstances of student misconduct by investigating each incident and then by imposing corrective measures it deemed to be reasonably tailored to the incident at hand, including by increasing punishments as needed. This is simply not a case where the employer ignored, downplayed, or gave only superficial lip service to complaints that its employees were being harassed while on the job. *See, e.g.*, *Freitag*, 468 F.3d at 533–35, 539–40 (prison could be held liable for repeated harassment of prison guard by inmates, where prison officials ignored and failed to act on multiple complaints of such harassment).

Finally, we must keep in mind that the DOE was dealing with the misbehavior of adolescent students. In this setting, DOE administrators imposed a variety of the quintessential disciplinary measures at their disposal, and to great effect. Campbell's suggestion that the DOE's response should have been even more severe and exacting—that it should have done everything in its means immediately and permanently to end all student harassment once it started—would be essentially impossible to satisfy, unless Campbell means to suggest that Title VII requires a school to behave in the most draconian way possible, perhaps by expelling any student who ever harasses a teacher. While such action may be appropriate in some situations, this is not what the law requires in all circumstances. *See, e.g.*, *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 732 (7th Cir. 2009) (school acted reasonably by suspending students who harassed teacher); *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 997 (7th Cir. 2002) (school responded reasonably to complaints of harassment in hallways by posting hall monitors to find and discipline responsible students).

### B

Aside from the student conduct that forms the core of her hostile work environment claim, Campbell alleges only two isolated incidents of harassment committed by school officials themselves, both relating to Vice Principal Jones.

### 1

First, Campbell argues that Jones created a hostile work environment when he chided Campbell for "ragging" at students and staff. A memorandum formally reprimanding Campbell for these actions stated that she "verbally ragged" a security officer and students, and it instructed her not to address people on campus "in a yelling or ragging manner."

Campbell argues that Jones's use of the phrase "ragging" or to "rag" on or at someone was sexually motivated and offensive. Namely, she contends that these comments are tantamount to the phrase "on the rag"—a phrase both sides concede can be a crass and insulting way to refer to a woman's menstrual cycle. She argues that a reasonable jury could therefore conclude that Jones's use of such language created a sexually hostile work environment. We disagree.

First, Campbell's argument entirely disregards the difference between the well-known phrase to "rag" or "rag on" something and the potentially offensive phrase "on the rag." As both the DOE's investigator and the district court found, the distinction is critical. The phrase to "rag" something is not at all offensive; it simply means "rail at" and "scold" or "torment" and "tease." Rag, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/rag (last visited May 29, 2018); *accord* Rag, *Oxford English Dictionary*, http://www.oed.com/view/Entry/157425 (last visited May

29, 2018).  *Webster's* gives a perfectly benign example: "[S]everal readers called in to *rag* the editor for his paper's repeated grammatical lapses."     Rag, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/rag (last visited May 29, 2018).  Campbell points to nothing that would contradict this well understood meaning of to "rag" or "rag on" something.  Instead, she conflates the phrases, repeatedly citing sources that recognize the offensive nature of specifically saying that a woman is "on the rag," but which say nothing of the phrases Jones actually used.

Second, even if Jones's one-time comments could somehow be construed as a veiled reference to Campbell's menstrual cycle, those isolated comments would not alone support a claim for a hostile work environment.  *See, e.g.*, *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010) ("A violation is not established merely by evidence showing sporadic use of abusive language, gender-related jokes, and occasional teasing." (internal quotation marks omitted)); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks omitted)); *Kortan*, 217 F.3d at 1110 (rejecting hostile work environment claim where offensive comments were "mainly made in a flurry" on one day).  As soon as Campbell complained about Jones's comments, the school investigated and found the incident to warrant no further punishment.  Such isolated comments were not part of a larger series of ongoing harassment that Campbell suffered; there is no suggestion that Jones had ever made such comments to her before or that he ever did again.

2

Second—and largely in passing—Campbell argues that Jones contributed to a hostile working environment by allegedly referring over the school's loudspeaker to female students who dressed as "hoochi mammas" and commenting at a faculty meeting that the students needed to "cover up their business." Certainly, these alleged remarks are gender-specific and potentially offensive. But, once again, such passing comments cannot support Campbell's claim for a hostile work environment, especially as they were not directed at Campbell or even at female employees in general. *Cf. Kortan*, 217 F.3d at 1110 (suggesting that comments directed at people other than the plaintiff are less severe). Indeed, it is not clear whether Campbell even heard Jones make such remarks herself; the only reference to them in our record is from the testimony of another school employee. And Campbell certainly has not found evidence to show that these alleged remarks about student attire were anything more than isolated incidents.

In sum, alone or in combination, the few isolated and relatively mild comments that Campbell alleges Jones made in reference to her or to female students are not sufficient to show a severe and pervasive environment that altered the terms or conditions of Campbell's employment. *See Prospect Airport Servs.*, 621 F.3d at 998–99; *Dominguez-Curry*, 424 F.3d at 1034. Because Campbell has not identified any other allegedly harassing conduct that can be attributed to the DOE, the district court did not err in

granting summary judgment to the DOE on Campbell's hostile work environment claims.[6]

## IV

Next, Campbell argues that the DOE violated Title VII's anti-retaliation provisions by taking action against her because she voiced complaints of harassment at the school. Title VII prohibits employers from "discriminat[ing] against" an employee "because he has opposed any practice" prohibited under Title VII. 42 U.S.C. § 2000e-3(a). To establish a prima face claim of retaliation, Campbell must be able to show that she suffered an adverse employment action because she engaged in activity protected by the statute. *See Davis*, 520 F.3d at 1093–94. Once again, if she can establish a prima facie case, then the *McDonnell Douglas* framework applies, shifting the burden to the DOE to show a non-retaliatory justification for the challenged action, and then back to Campbell to show that the proffered justification is pretextual. *Id.* at 1088–89, 1094–95.

## A

The DOE argues that, once again, Campbell cannot establish even a prima facie case because the record does not support a finding that she suffered any adverse employment

---

[6] For these same reasons, we reject Campbell's suggestion that her resignation was "not voluntary" and that in effect she was constructively discharged. Because Campbell does not raise a genuine issue of material fact regarding the hostile work environment claim, she likewise fails to raise a genuine issue of material fact on constructive discharge. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).

action.[7]  And Campbell indeed relies on the same alleged adverse actions discussed above to support her retaliation claims.  But, even though such actions are insufficient to sustain a prima facie case of disparate treatment, Title VII retaliation claims may be brought against a much broader range of employer conduct than substantive claims of discrimination.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006).  Namely, a Title VII retaliation claim need not be supported by an adverse action that materially altered the terms or conditions of the plaintiff's employment; instead an allegedly retaliatory action is subject to challenge so long as the plaintiff can show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted).  Thus, even though the DOE's alleged actions cannot support Campbell's claims of disparate treatment, the same is not necessarily true for her retaliation claims.

To be sure, even under this broader standard, most of the alleged adverse actions cannot support a prima facie case of retaliation.  For the same reasons discussed above, Campbell has simply failed to identify any evidence in the record that would support her assertions that she was denied an appropriately submitted request to transfer to a vacant position at another school or that she was denied an opportunity to receive paid administrative leave.  Likewise, even if the school did lose its copy of Campbell's satisfactory 2006 performance evaluation, Campbell has not pointed to any evidence to support the notion that such loss,

---

[7] The DOE does not dispute that Campbell may be able to establish the other elements of a prima facie case.

standing alone, is the type of "material adversity" that would reasonably chill a teacher from exercising her protected rights in the future. *See id.* (emphasis omitted).

But two potential adverse employment actions remain: (1) the DOE's investigation into Campbell's alleged misconduct and (2) Campbell's assignment to teach remedial math for the 2009–2010 school year. We have previously indicated that merely investigating an employee—regardless of the outcome of that investigation—likely can support a claim for Title VII retaliation. *See Lakeside-Scott*, 556 F.3d at 803 n.7; *Poland*, 494 F.3d at 1180. And a generous reading of Campbell's allegations might suggest that Principal Scofield intentionally assigned Campbell to teach a subject that she knew Campbell disliked. Even if such assignment did not alter the terms or conditions of Campbell's employment, arguably such intentionally unfavorable assignments could be expected to dissuade other teachers form voicing complaints in the future.

We assume *arguendo* that either of these two allegations could support Campbell's prima facie case for retaliation. Even if so, Campbell's claims fail at the remaining steps of our *McDonnell Douglas* inquiry.

## B

Once Campbell establishes a prima facie case for retaliation, the burden shifts to the DOE to produce evidence showing that the challenged actions were done for non-retaliatory purposes. Thus, assuming that Campbell can establish a prima facie claim based on the school's decision to investigate her and her assignment to teach remedial math, the DOE must show that both actions were, in fact, supported by neutral reasons. If it does, the burden then shifts back to

Campbell to point to evidence that may show the DOE's asserted rationale to be mere pretext.

1

Based on the evidence in the record, the DOE has clearly met its burden of supplying evidence of neutral, non-retaliatory reasons for its actions. First, the DOE has provided unrebutted evidence that it investigated Campbell specifically because it received multiple allegations of misconduct against her from parents, students, and staff. There is no dispute that the DOE is permitted—indeed, required—to investigate when it receives credible allegations of teacher misconduct and in particular to ensure the wellbeing of its students.

Second, Principal Scofield testified that she assigned Campbell to teach remedial math because there were not enough music classes available to fill a teaching schedule. She testified that this was in keeping with her standard practice for ensuring teachers had full-time schedules when there were not enough courses in their certified areas, and that any other teacher in Campbell's position would have received a similar assignment.

2

Campbell has not pointed to evidence that would carry her burden of showing that the school's neutral justifications for its actions were pretextual. Campbell may do so either "directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Davis*, 520 F.3d at 1089 (internal quotation marks omitted). She has not identified evidence that could be sufficient to do either.

First, Campbell has essentially not responded to the DOE's assertion that it had to investigate, and could not ignore, the credible allegations of misconduct against her. Campbell certainly does not dispute that students, parents, and coworkers had levied such accusations against her—accusations which, it turns out, were found largely to be true. And she has not pointed to evidence that would show that other DOE employees were let off the hook when similar allegations had been raised. Indeed, the record shows that at least Vice Principal Jones was similarly investigated when Campbell herself accused him of harassment. Elsewhere, Campbell refers to the DOE's investigation of other teachers who were accused of misconduct, with no suggestion that such teachers had similarly engaged in protected activity under Title VII. In short, Campbell has pointed to no evidence at all to dispute, let alone to refute, the school's neutral justification for its decision to investigate her.

Second, Campbell does not dispute that there were not enough band and music classes available to fill her schedule during the 2009–2010 school year, nor that she was required to teach six classes as a full-time teacher, nor that it was common for the school to assign teachers to classes outside their core areas when necessary. Instead, Campbell's only argument that the DOE's justification for assigning her to teach remedial math was pretextual seems to be that Mr. Ota was allowed to teach Japanese as an additional subject, though she was not allowed to teach French. However, Campbell has identified no evidence that there were indeed French classes available to be taught during the 2009–2010 school year. Nor has she given any reason to believe that Mr. Ota preferred to teach Japanese over other subjects that might have been available, like remedial math. And, of course, Campbell's recognition that Mr. Ota was also assigned to teach a class outside his core area seems to

undermine—not support—her claim of pretext. The simple fact that Mr. Ota was not also assigned to the specific class that Campbell apparently disliked is not enough to show that the school was more likely motivated by retaliatory animus than by its stated legitimate reasons for assigning such class to Campbell.

Campbell has failed to raise a triable issue regarding her retaliation claim.

## V

Finally, Campbell argues that the DOE's conduct violated Title IX's command that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Campbell claims that the DOE violated this provision both by directly and intentionally discriminating against her in the ways described above, and by acting with deliberate indifference to the sexual harassment she endured from students and from Vice Principal Jones.

## A

Campbell's Title IX claims for intentional sex discrimination mirror those she raised under Title VII. Indeed, federal courts generally evaluate employment discrimination claims brought under both statutes identically, and the parties concede that the same analysis should apply to both here. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996); *see also Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 865 n.4 (8th Cir. 2011) (collecting Title IX cases applying guidance from

Title VII standards); *Oona R.S. v. McCaffrey*, 143 F.3d 473, 476–78 (9th Cir. 1998) (discussing applicability of Title VII standards to Title IX claims). Thus, for the same reasons expressed above, the district court did not err in granting summary judgment to the DOE on Campbell's Title IX discrimination claims.

B

Likewise, Campbell's claim that the DOE acted with deliberate indifference to the sexual harassment she endured from students and from Vice Principal Jones essentially just repeats her Title VII claim that the DOE fostered a hostile work environment by failing reasonably to respond to Campbell's complaints of harassment. Indeed, under Title IX the DOE may be held liable for its deliberate indifference to the harassment Campbell allegedly endured only if its response to such harassment was "clearly unreasonable." *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (internal quotation marks omitted). Because it cannot be doubted that the school's thorough response to Campbell's complaints of student harassment was reasonably calculated to end the problem, the DOE cannot be said to have been deliberately indifferent to the situation. Likewise, we see no basis in the record to support a conclusion that the DOE acted with deliberate indifference to Campbell's complaints about harassment from Vice Principal Jones. Just as was the case with Campbell's complaints of student misconduct, the DOE immediately conducted an investigation into her allegations against Jones. That investigation ultimately determined that Jones had not engaged in misconduct. Campbell does not contend that the process that led to this conclusion was somehow inadequate. And Campbell does not assert that Jones thereafter did anything else to harass her. In sum, Campbell

34    CAMPBELL V. STATE OF HAWAII DEP'T OF EDUC.

has not pointed to anything in the record that would show the school's handling of her complaints against Jones was clearly unreasonable.

The district court did not err in concluding that Campbell's Title IX claims fail for essentially the same reasons that her Title VII claims do.

VI

The judgment of the district court is **AFFIRMED**.